UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
LATOYA STEWART,

                   Plaintiff,

       - against -

COMMISSIONER OF SOCIAL SECURITY,

                   Defendant.
-----------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

**MEMORANDUM AND ORDER**

16-CV-2849 (RRM)

     Latoya Stewart brings this action against Carolyn W. Colvin,[1] then-Acting Commissioner

of the Social Security Administration (the "Commissioner"), pursuant to 42 U.S.C. §§ 405(g),

1383(c)(3) seeking review of the determination that Stewart is not entitled to Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act") and Supplemental

Security Income benefits ("SSI") under Title XVI of the Act.  Stewart maintains that the

Commissioner's determination is not supported by substantial evidence.  Both Stewart and the

Commissioner have cross-moved for judgment on the pleadings pursuant to Federal Rule of

Civil Procedure 12(c).  (Pl.'s Mem. (Doc. No. 14); Def.'s Mem. (Doc. No. 16).)  For the reasons

set forth below, the Commissioner's motion is granted, and Stewart's motion is denied.

## BACKGROUND

### I.    Procedural History

     Stewart protectively filed applications for disability insurance benefits and supplemental

security income, alleging disability since April 24, 2012, due to her pseudotumor cerebri.

---

[1] Carolyn Colvin is no longer the Acting Commissioner of Social Security.  Pursuant to Federal Rule of Civil
Procedure 25(d), the current Acting Commissioner, Nancy Berryhill, is substituted as the proper defendant.

(Admin R. at 272–75; 111–12.)  She alleges that she has headaches and dizzy spells, which make it impossible to work.  (*Id.* at 27, 333.)  Her application was denied, and Stewart requested a hearing.  (*Id.* at 136–43; 144–46.)  Stewart testified at four separate hearings, held on December 10, 2013, May 22, 2014, September 10, 2014 and January 8, 2015.  (*Id.* 29–104; 102–03; 87–87; 50–62; 11–13.)  The multiple hearings were adjourned so that Stewart and the ALJ could obtain records from a neurologist at the State University of New York Downstate Medical Center ("SUNY Downstate").  (*Id.* 86–87.)  By written decision, ALJ Kieran McCormack found that Stewart was not disabled, but rather could perform sedentary work with certain restrictions.  (*Id.* at 113–35.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Stewart's request for review.  (*Id.* at 1–5.)  This action followed.

## II.  Administrative Record

### a.  Non-Medical Evidence

Stewart was born in 1981 and has a GED.  (*Id.* at 37, 69.)  For three months in 2006, Stewart worked for a car service company, where she made reservations.  (*Id.* at 72–73; 39–40.)  From 2006 to 2012, she held a variety of part-time positions, including market research, childcare, hair dressing, and resume preparation.  (*Id.* at 22–25, 73–76.)  She testified that she no longer works as a hairdresser because her hands "cramp up."  (*Id.* at 25.)  From November 2011 to about March 2012, Stewart worked as a part-time market researcher, conducting surveys.  (*Id.* at 71–72.)  She obtained a home health aide certificate in September 2012, and worked as a home health aide from October 2011 through April 2012.  (*Id.* at 41, 69, 71.)

Stewart completed a function report on July 20, 2012 in connection with her application for disability benefits.  (*Id.* 366–374.)  She reported that on a typical day, she washes her face, eats, takes her medication, naps, showers, and eats.  (*Id.* at 367.)  She takes care of her children

and cat.  (*Id.*)  Her children look after the cat as well, and her sister helps looking after the kids and with grocery shopping.  (*Id.*)  Stewart and her sister go grocery shopping twice a month for 15 minutes.  (*Id.* at 370.)  Before she was diagnosed with pseudotumor cerebri, Stewart was able to walk without supervision, work, and sit for long periods of time.  (*Id.*)  She notes that her ailment interferes with her sleep, and that sometime she cannot fall asleep until five in the morning.  (*Id.*)  She checked off that she has no problem with personal care, but that she has to be "extra careful" not to lose balance in the shower.  (*Id.* at 367.)  She noted that she makes dinner every other day, but standing at the stove makes her dizzy because her feet swell.  (*Id.* at 368.)  She does not perform house or yard work because her balance is "off," and she experiences dizzy spells when she moves around.  (*Id.*)  Similarly, she does not like to go outside because of the risk of falling.  (*Id.*)  Stewart reported that she is able to pay bills, count change, and handle a savings account.  (*Id.* at 370.)

Her hobbies include watching TV and playing cards.  (*Id.*)  She watches TV all day because she is not able to sit and play cards "without pain."  (*Id.*)  When prompted to discuss her social activities, Stewart wrote that she does not feel well enough to go outside and hang out with friends.  (*Id.* at 371.)  She wrote that she only lifts "light things," does not like to stand "longer than necessary," and walks slowly.  (*Id.*)  The furthest she can walk is one block, and she rests two minutes before walking again.  (*Id.* at 373.)  She noted that she has "no problems" sitting, but has blurry vision and cannot kneel.  (*Id.* at 372.)  She has no problems reaching, using her hands, or talking, though sometime her words "get mixed up."  (*Id.*)  She can follow both written and spoken instructions.  (*Id.* at 373.)  Her head hurts when she gets "stressed or upset."  (*Id.* at 374.)  Her mind sometimes "drifts off," but for the most part she does not have any trouble remembering.  (*Id.*)

Stewart testified at the hearing on May 22, 2014 before ALJ Margaret Donaghy. (*Id.* at 65–87.) She told the ALJ that she lives in an apartment with her three children, aged 15, 13, and 11. (*Id.* at 70.) She last worked in April 2012 as a home health aide, but stopped working because she "got sick." (*Id.* at 71.) Since then, she has suffered from headaches, dizzy spells, and back pain. (*Id.* at 76.) She testified that she sees a neurologist for her headaches and dizziness, and has gone to physical therapy twice to manage her back pain. (*Id.* at 76–77.) She testified that she was taking Topamax (for her headaches), Diamox (for her nausea), vitamin D, and ibuprofen as needed. (*Id.* at 79.) When taking Topamax, Stewart did not get headaches as often. (*Id.*) As for her daily routine, she explained that she prefers to stay inside because she does not feel "as stable" when she goes outside. (*Id.* at 81.)

At the January 8, 2015 hearing, Stewart related that her hands cramp, face twitches, back hurts, and that she feels unstable. (*Id.* at 25.) She explained that her pseudotumor gives her headaches and makes her dizzy. She noted that Topamax helps a lot with her nausea and headaches, and she takes Ibuprofen 800 to ease her back pain. (*Id.* at 25, 26.)

At the same hearing, Stewart provided some insight into how she spends her days. (*Id.* at 28–30.) When she does not have an appointment, she spends the whole day at home. (*Id.* at 28.) She takes a shower and brushes her teeth, watches TV, eats breakfast, takes her medicine, and then naps. (*Id.* at 29.) Her kids are old enough to cook for themselves, but once in a while, she will cook as well. (*Id.* at 29.) She explained that she spends most of her days asleep. She wakes up a noon or one, eats and watches TV, goes back to sleep at six, wakes up at nine to take her medicine, watches some more TV, and then goes back to bed. (*Id.* at 29.) Stewart surmised that the diamox, used to treat her pseudotumor, was making her drowsy. (*Id.* at 30.)

On the days Stewart has doctor appointments, she does not take her medicine, but showers and gets dressed before heading to her appointment. (*Id.* at 31.) Generally, she takes buses to get to the doctors' offices. (*Id.*) She acknowledged that she can bathe and dress herself without assistance, and can do some chores around the house, like making her bed and cooking, without her children's help. (*Id.* at 32.) She goes food shopping, but never by herself; her children do the laundry. (*Id.* at 33.)

### b. Medical Evidence

Stewart is 5'6" tall and weighs about 360 pounds. She was diagnosed with pseudotumor cerebri in 2012, after she was admitted to Kingsbrook Jewish Medical Center with complaints of intermittent vomiting for two weeks, dizziness that increased with movement, headaches, and severe vertigo. (*Id.* at 471, 475.) She was additionally diagnosed with hypertension and morbid obesity. (*Id.* at 444–47.) Stewart takes Diamox and acetazolamide for the pseudotumor, Topamax for the headaches, and ibuprofen for any pain. (*Id.* at 441, 475, 461.) Additionally, she takes ferrous sulfate for iron and folic acid to treat a low blood count. (*Id.* at 347.) She noted in a form, which the Social Security Administration received August 7, 2014, that her doctors have told her to keep taking her medication. (*Id.* at 440.)

#### i. *Inna Geyler, D.O.*

Dr. Geyler saw Stewart between May 2012 and June 2013. Her diagnoses remained consistent throughout. On May 30, 2012, and then against on June 15, Dr. Geyler wrote that Stewart suffers from obesity, chronic obstructive pulmonary disease ("COPD"), and pseudotumor cerebri. (*Id.* at 683, 681.) On June 29, 2012, an MRI of Stewart's brain suggested she has intracranial hypertension. (*Id.* at 653.) It also revealed an infarct in the right posterior parietal cortex. (*Id.* at 652.) A magnetic resonance (MR) venogram was recommended. (*Id.*)

On July 10, 2012, Dr. Geyler again noted that Stewart has pseudotumor cerebri and has headaches.  (*Id.* at 680.)  An x-ray performed on October 10, 2012, revealed degenerative spondylosis in Stewart's lower thoracic spine.  (*Id.* at 573.)

A follow-up x-ray, conducted in May 2013, revealed no significant change.  (*Id.* at 540.)  It showed a straightening of the normal cervical lordosis, but was otherwise "unremarkable."  (*Id.*)  An MRI of Stewart's brain revealed partially empty sella and mild prominence of the preoptic subarachnoid spaces, which is suggestive of idiopathic intracranial hypertension.  (*Id.* at 538.)  It did not reveal any intracranial abnormality.  (*Id.* at 539.)  At an appointment in June 2013, Dr. Geyler diagnosed Stewart with pseudotumor cerebri, cervical spine muscle spasm, sleep apnea, obesity, and blurry vision.  (*Id.* at 674.)

　　　　ii.　　*Irina Kogan, M.D.*

On July 30, 2012, Stewart saw Dr. Kogan, a neurologist.  (*Id.* at 524.)  She complained of headaches, tremors, dizzy spells, and numbness/tingling.  (*Id.*)  An August 6, 2012 electroencelphalogram (EEG) was normal.  (*Id.* at 697.)  An August 9, 2012 MR venogram revealed no evidence of venous sinus thrombosis.  (*Id.* at 525.)  An MR angiogram of her brain revealed no evidence of aneurysm, vessel stenosis, or vascular malformation.  (*Id.* at 526.)  In November 2012, Dr. Kogan completed a treating physician's wellness report plan.  (*Id.* at 556.)  She noted that Stewart has pseudotumor cerebri, headaches, dizzy spells, blurred vision, and a venous abnormality, and concluded that Stewart's condition was chronic.  (*Id.* at 556, 557.)  She checked off that Stewart is unable to work for at least 12 months.  (*Id.* at 557.)

A January 2013 EEG, performed at Lutheran Medical Center, found no definite interictal epiletiform activity.  (*Id.* at 536.)

### iii. *Anuja Reddy, M.D.*

In October 2012, Stewart was evaluated by Dr. Reddy, who works for the Federation Employment and Guidance Service.[2] (*Id.* at 506.) As part of the Biopsychosocial Report, Dr. Reddy conducted a physical examination of Stewart in which she found that Stewart is able to wash dishes and clothes, sweep and mop the floor, vaccum, watch TV, grocery shop, cook meals, read, socialize, get dressed, bathe, use the toilet, and groom herself. (*Id.*) Stewart reported that she took acetazolamide, sumatriptan, ferrous sulfate, folic acid, and hydrochlorothiazide. (*Id.* at 508.) Stewart can sit for six to eight hours, stand and walk for one to three, and reach and grasp for one to three hours as well. (*Id.* at 511.) She is limited in her lifting, pushing, pulling, dusting, and climbing. (*Id.*) Dr. Reddy noted that Stewart should not carry heavy weights. (*Id.* at 513.) She assessed that Stewart is "temporarily unemployable." (*Id.*) On another wellness re-examination form, Dr. Reddy opined based on Stewart's limited ability to lift, push, pull dust or climb, she was "unable to work." (*Id.* at 517.) Stewart appears to have said that her medications have not improved her symptoms. (*Id.*)

### iv. *Robolge Lenora, M.D.*

In July 2013, Stewart underwent a sleep study at the Institute for Sleep and Breathing to treat her sleep apnea. (*Id.* at 558–59.) Dr. Lenora determined that Stewart has severe obstructive sleep apnea, and recommended a CPAP titration study, as well as a course of weight reduction. (*Id.* at 559.) Stewart then underwent a CPAP titration study in November 2013. (*Id.* at 589.) The study was "most successful" in eliminating airway obstruction, snoring, and improving

---

[2] The Federation Employment and Guidance Service was a New York City program that provided assistance for "applicants and recipients with complex clinical barriers to employment, including medical, mental health, and substance abuse conditions, to obtain employment or federal disability benefits." *Paredes v. Comm'r of Soc. Sec.*, No. 16-CV-810 (BCM), 2017 WL 2210865, at *4 (S.D.N.Y. May 19, 2017) (internal quotation marks omitted).

oxygen saturation. (*Id.*) Stewart saw Dr. Shukla for the sleep study results. (*Id.* at 580–81.) Dr. Shukla recommended weight loss and an allergy skin test. (*Id.*)

### v. Trevor Resnick, Physical Therapist (December 2013)

On December 3, 2013, Stewart saw Trevor Resnick, a physical therapist at First MedCare, because of lower-back pain. (*Id.* at 569.) She explained that she had experienced back pain ever since she underwent a spinal tap to diagnose her pseudotumor. (*Id.*) She related that her pain has become more intense and more constant over the past month. (*Id.*) Prolonged standing and walking, sleeping on her back and lifting all intensify Stewart's spondylosis. (*Id.*) Resnick found tenderness and spasm in the paralumbar area, and noted that Stewart has poor posture. (*Id.* at 571.) He recommended physical therapy two times per week for eight weeks. (*Id.*)

### vi. David Edelstein, M.D.,

In January 2014, Stewart saw Dr. Edelstein for an ophthalmological examination. (*Id.* at 662.) Her vision acuity corrected was 20/20; a slit lamp exam was "entirely benign;" and dilation revealed a full-looking optic nerve with no obvious blurring. (*Id.*) Dr. Edelstein ordered a visual field test, which she underwent in February. (*Id.* at 662, 664–65.)

### vii. Narayan Paruchuri, M.D.

A November 2014 MRI revealed a diffuse disc bulge with moderate to severe bilateral foraminal impingement and lateral recess stenosis. (*Id.* at 802.) The disc bulge abutted the SI nerve roots. (*Id.*)

## c. Consultative Medical Evidence

On September 7, 2012, David Finkelstein, M.D., a consultative neurologist, examined Stewart. (*Id.* at 519–21.) Stewart reported daily headaches that lasted for hours and described

the pain as "exploding." (*Id.* at 519.) Sumatripan helped with the pain, but yelling and standing worsened her headaches. (*Id.*) Stewart also had back pain and feet swelling, rated as a three out of ten, but could reach 12 out of 10 if she "pushes herself." (*Id.*) She had dizzy spells once a day that lasted about 10 minutes and involved room-spinning vertigo. (*Id.*) Her balance was "off." (*Id.*) She reported that she cooks twice a week, and cleans and does laundry once a week. (*Id.* at 520.) She showers, bathes, and dresses herself every day; she watches TV, listens to the radio and goes out for doctor appointments. (*Id.*)

Dr. Finkelstein noted that Stewart did not appear to be in acute distress and that her speech was normal. (*Id.*) Her gait was normal "for a morbidly obese person," but she could not walk on heels and toes without difficulty. (*Id.*) She does not use an assistive device. (*Id.*) She was able to change and to get in and out of the chair. (*Id.*) Her hand and finger dexterity was intact. (*Id.*) Finkelstein noted his prognosis for Stewart's pseudotumor as "fair to guarded." (*Id.* at 521.) He reported that Stewart has ongoing risks to her vision because of the pseudotumor, and that her headaches may limit her ability "to sustain activities." (*Id.*) He advised that she avoid heights and heavy machinery, as these could stimulate her dizziness. (*Id.*) Dr. Finkelstein noted as well that back pain and paresthesias, or tingling/numbness, may limit Stewart's ability to sustain activities, and that she had "some mild limitations" in her ability to walk. (*Id.*)

On October 25, 2012, Dr. Marasigan, a state agency medical consultant, noted that Stewart's neurological examination was normal, and that she has a visual acuity of 20/20. (*Id.* at 531.) Based on a review of the record, Dr. Marasigan determined that Stewart can lift up to 20 pounds and carry up to 10; she can stand, walk or sit for six hours a day, but should avoid heights and hazardous machinery. (*Id.*)

### d. Vocational Expert

Vocational expert Miriam Green testified at the January 8, 2015 hearing. (*Id.* 34–48; 266–67.) Green found that Stewart's past job as a taxi dispatcher constitutes past relevant work. (*Id.* at 40.)[3] The job is sedentary and semi-skilled. (*Id.* at 41.) The ALJ asked Green to consider an individual, who can: perform light work, but cannot work at jobs requiring fine vision and operation of motorized vehicles, cannot operate heavy machinery, and may not be exposed to workplace hazards such as unprotected heights, machinery and/or machinery with moving mechanical parts. (*Id.* 44–45.) Green responded that an individual with this residual functional capacity could still work as a taxi dispatcher, both as Stewart performed the job and as described by the Dictionary of Occupational Titles. (*Id.* at 45.) The ALJ next asked Green to consider whether there are other jobs in the national economy that such an individual could perform. Green responded that an individual with these types of restrictions could be an usher, a sales attendant in a self-service store, and a price marker. (*Id.* at 44.)

The ALJ then asked Green to consider the same hypothetical individual, but with the added limitation that she could perform sedentary work, instead of light work. (*Id.* at 44.) Green responded that such an individual would still be able to work as a taxi dispatcher. (*Id.* at 45.) In addition, this individual could also work as a telephone salesperson, a charge account clerk, or order clerk. (*Id.* at 45.)

The ALJ then asked Green to consider the same hypothetical individual, who could perform sedentary work, but would be off-task at least 15 percent of the day. (*Id.* at 45–46.) Green answered that this individual could not perform competitive work. (*Id.* at 46.) Stewart

---

[3] Stewart's past work as a hairdresser, babysitter, market researcher, and home health aide do not count as past relevant work because she did not earn enough money for them to count as substantial gainful employment. (Admin R. at 37, 43.)

asked Green if working as an usher required much standing.  (*Id.* at 46.)  Green responded that

light work includes standing much of the time, and Stewart noted that this would be "an issue"

for her.  (*Id.*)

## STANDARD OF REVIEW

### I.        Review of Denial of Social Security Benefits

Unsuccessful claimants seeking disability benefits under the Act may seek judicial

review of the Commissioner's decision by bringing an action in federal district court "within

sixty days after the mailing . . . of notice of such decision or within such further time as the

Commissioner of Social Security may allow."  42 U.S.C. § 405(g).  However, the Court does not

make an independent determination about whether a claimant is disabled when reviewing the

final determination of the Commissioner.  *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

The Court reviews "the administrative record *de novo* to determine whether there is substantial

evidence supporting the Commissioner's decision and whether the Commissioner applied the

correct legal standard."  *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) (internal quotations

and citations omitted).  Substantial evidence means "more than a mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389,

401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence,

the reviewing court is required to examine the entire record, including contradictory evidence

and evidence from which conflicting inferences can be drawn."  *Talavera v. Astrue*, 697 F.3d

145, 151 (2d Cir. 2012) (internal quotation marks omitted).  "If there is substantial evidence in

the record to support the Commissioner's factual findings, they are conclusive and must be

upheld." *Stemmerman v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y.

Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This deferential standard of review does not apply,

however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330,

342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected

the disposition of the case . . . [an ALJ's] failure to apply the correct legal standards is grounds

for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks

omitted).

## II.     Eligibility Standard for Disability Insurance Benefits

To establish eligibility for DIB, an applicant must produce medical and other evidence of

disability. *See* 42 U.S.C. § 423(d)(5)(A). To be found disabled, the claimant must have been

unable to work due to a physical or mental impairment resulting from "anatomical,

physiological, or psychological abnormalities, which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(1)(A). This impairment must

have lasted or be expected to last for a continuous period of not less that twelve months. *Id.*; *see*

*also Barnhart v. Walton*, 535 U.S. 212 (2002). Further, the applicant's medically determinable

impairment must have been of such severity that he is unable to do his previous work or,

considering his age, education, and work experience, he could not have engaged in any other

kind of substantial gainful work that exists in significant numbers in the national economy. *See*

42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, the Commissioner

engages in the following five-step analysis:

> [1] First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity.
>
> [2] If he is not, the Commissioner next considers whether the claimant has a
> "severe impairment" which significantly limits his physical or mental ability
> to do basic work activities.

[3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.

[4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

[5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera*, 697 F.3d at 151 (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); 20 C.F.R. § 404.1520. The claimant has the burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner for the fifth step. *See Talavera*, 697 F.3d at 151.

### III.    Eligibility Standard for Supplemental Security Income

To qualify for SSI benefits, a claimant must show that he is disabled, and therefore "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). This requires the same five-step analysis as detailed above.

### DISCUSSION

### I.    The ALJ Properly Followed the Five-Step Analysis

The ALJ first found that Stewart had not engaged in substantial gainful activity since April 24, 2012, the alleged onset date. (Admin R. at 119.) The ALJ next concluded that Stewart's pseudotumor cerebri, lumbar-spine disorder, and morbid obesity constitute severe impairments. (*Id.*) He also noted that she suffered from straightening of the normal cervical

13

lordosis and obstructive sleep apnea, but deemed these non-severe impairments. (*Id.*) As the ALJ explained, the record does not indicate that Stewart has "exhibited any significant impairment in the cervical spine" and has not received any treatment for it. (*Id.*) As for Stewart's sleep apnea, the ALJ noted that her response to the CPAP treatment had been "excellent." (*Id.* at 120.)

The ALJ determined that Stewart does not have an impairment that meets or equals the severity of one of the impairments listed Appendix 1 of the regulations. (*Id.*)

The ALJ found that Stewart had the residual functional capacity to perform sedentary work[4] with several limitations. (*Id.* at 120.) Specifically, he found that Stewart cannot work at jobs requiring fine vision,[5] the operation of cars, trucks, vans and any other motorized vehicles, or the operation of heavy machinery. (*Id.*) Additionally, she cannot work at jobs containing even moderate exposure to workplace hazards, such as unprotected heights, unprotected machinery, and/or machinery with moving mechanical parts. (*Id.*) Having found that Stewart can perform certain types of sedentary jobs, the ALJ determined that she can return to her past relevant work as a taxi dispatcher. (*Id.* at 126.) In the alternative, the ALJ further ruled that, even in light of Stewart's restrictions, there are other jobs that exist in significant numbers in the national economy that Stewart could work at. (*Id.* at 127.) For example, Stewart could work as a telephone salesperson, a charge account clerk, or an order clerk. (*Id.*) Accordingly, the ALJ

---

[4] Sedentary work is defined as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

[5] This is defined as jobs requiring more than frequent use of near acuity, far acuity, peripheral acuity and/or depth perception. (Admin R. at 120.)

determined that Stewart is not disabled, and denied her applications for disability insurance benefits and supplemental security income. (*Id.* at 128.)

## II. The ALJ Fulfilled the Duty to Develop the Record

Because a hearing on disability benefits is non-adversarial, an ALJ has a duty to develop the record. *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996); 42 U.S.C. § 423(d)(5)(B). Whether the ALJ satisfied the duty to develop the record is a threshold question. Before determining whether substantial evidence supports the ALJ's determination, "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulation' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)).

The regulations explain that before an ALJ determines whether the claimant is disabled, he will develop a "complete medical history" and will "will make every reasonable effort to help" the claimant get the medical evidence. 20 C.F.R. § 404.1512(d). The regulations clarify that a "complete medical history" refers to "records of the [claimant's] medical source(s), covering at least the 12 months preceding the month" in which the claimant filed the application for disability benefits. 20 C.F.R. § 404.1512(b)(ii). The ALJ may request that the claimant undergo a consultative examination, but he will not request such an exam until he has "made every reasonable effort to obtain evidence" from the claimant's "own medical sources." *Id.* Where "there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (internal quotation marks omitted).

Stewart argues that the ALJ failed to adequately develop the record because he did not re-contact Dr. Kogan "for further information or clarification" after according little weight to her opinion that Stewart is unable to work. (Pl.'s Mem. at 10.) Stewart suggests that the Commissioner should have re-contacted Dr. Kogan because the ALJ found there to be an inconsistency between her treatment notes and her determination that Stewart is unable to work for 12 months. This argument, however, relies on a now-rescinded rule. While the Commissioner once had a requirement that it re-contact medical sources to resolve any inconsistency or insufficiency of the evidence, this rule was rescinded in February 2012. *See* How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10651–01 (Feb. 23, 2012) (rescinding the requirement to recontact medical sources first when there is an inconsistency or insufficiency in the evidence in order to provide the ALJ greater flexibility in determining how best to obtain the needed information). So long as the ALJ had a complete medical record, he was under no obligation to contact Dr. Kogan to resolve any perceived inconsistency in her evaluation.

The ALJ here properly fulfilled his duty to develop the record by compiling Stewart's complete medical history. The administrative record is replete with the Commissioner's requests, as well as follow-up requests, for Stewart's medical evidence from her various doctors, and hospitals, where Stewart was treated. (*Id.* 431, 434–39, 543, 574, 652, 670.) When Stewart claimed that the administrative record was missing her documents from SUNY Downstate, the ALJ contacted the hospital multiple times to request her medical records and adjourned the hearing three times to ensure that the administrative record contained a complete medical history. (*Id.* at 11, 13, 221, 434, 435, 436, 437, 438, 439, 670.) The record now includes comprehensive documentation of Stewart's treatment since 2012.

Though Stewart does not raise this point, the Court notes that the record in this case is thin on medical source statements that provide opinion testimony or insight into how Stewart's impairments affect her day-to-day life and ability to work. *See, e.g.*, *Battaglia v. Astrue*, No. 11-CV-2045 (BMC), 2012 WL 1940851, at *7 (E.D.N.Y. May 29, 2012) (noting that district courts in this circuit have repeatedly found that the ALJ has an affirmative obligation to request medical source statements, "regardless of whether a plaintiff's medical record otherwise appears complete."). This is not for lack of trying, though. The Commissioner sent requests to Stewart's treating physicians, including Dr. Geyler and Dr. Orellana, her primary physician, to fill out medical source statements. (*Id.* at 415, 546). It never received one from either doctor. The only doctor to send back a medical source statement was Dr. Edelstein, Stewart's ophthalmologist, who was unable to provide any insight into the effect of Stewart's impairments on her ability to work. (Admin R. at 789– 90.) The ALJ therefore fulfilled his duty to develop the record by requesting that Stewart's treating physicians send their treatment notes as well as medical source statements and by arranging for Stewart to meet with a consultative examiner.

Ultimately, the Commissioner compiled Stewart's complete medical history from her various treating physicians, and therefore the ALJ had an extensive medical record to guide his analysis of Stewart's capacity to work. Thus, there were no obvious gaps in the record that would require remand. *See, e.g.*, *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (holding that where there are no obvious gaps in the record, the court will not remand "solely on the ground that the ALJ failed to obtain a formal opinion from one of [the claimant's] treating physicians regarding the extent of [the claimant's] impairments . . ."); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29 (2d Cir. 2013) (same).

### III.     The ALJ Did Not Violate the Treating Physician Rule

Generally, an ALJ gives more weight to a claimant's treating sources because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of the claimant's ailments and "may bring a unique perspective to the medical evidence." 20 C.F.R. § 404.1527(c)(2).  An ALJ who declines to give controlling weight to a treating physician must give "good reasons" for his determination, and base his conclusion on several factors, including "(i) the frequency of the examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." *Schaal v. Apfel*, 134 F.3d 496, 503–04 (2d Cir. 1998); *see also* 20 C.F.R. § 404.1527(b).  The ALJ's decision must make clear that he "applied the substance of the treating physician rule," even if the ALJ did not discuss each factor individually. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  When a treating physician's opinion is unsupported or inconsistent with other substantial evidence, the ALJ is not required to afford deference to that opinion and may use his discretion in weighing the medical evidence as a whole. *Halloran*, 362 F.3d at 32.

Here, Stewart challenges the ALJ's residual functional capacity determination, and argues that the ALJ violated the treating physician rule because he gave "little weight" to Dr. Kogan. (Pl.'s Mem. at 9–10.)  She argues that "[t]here is no inconsistency between Dr. Kogan's conclusions and the medical evidence as a whole." (*Id.* at 10.)  The ALJ ignored Dr. Kogan's conclusion in a medical wellness report, where she checked off that Stewart is unable to work for at least 12 months.  (Admin R. at 557, 124.)  The ALJ was entitled to do so because he has the sole responsibility for determining whether a plaintiff is "disabled" under the Act.  20 C.F.R. §

404.1527(d).  The ALJ's determination was especially appropriate in light of the fact that Dr.

Kogan saw Stewart for only a few months in 2012, and therefore did not possess a "longitudinal

understanding" of Stewart's "history and symptoms."  (Admin R. at 124.)

Furthermore, substantial evidence contradicts Dr. Kogan's conclusions.  For instance, Dr.

Kogan found that Stewart suffers from dizziness, headaches and blurry visions, but Stewart later

testified that her medication has improved her dizziness and headaches.  (*Id.* at 25, 27, 79, 80.)

She has explained that her headaches used to be "constant," but not anymore.  (*Id.* at 80.)

Additionally, an August 9, 2012 brain MRI revealed normal findings, and a January 2013 EEG,

performed after Dr. Kogan last saw Stewart, showed no definite epileptiform or seizure activity.

(*Id.* at 536.)

Substantial evidence supports the ALJ's finding that Stewart is capable of performing a

range of sedentary work with certain restrictions.  Because the ALJ could not obtain medical

source treatments from Stewart's treating physicians, he largely relied on Stewart's own

statements and Dr. Finkelstein.  (*Id.* at 123–24.)  The record reflects that Stewart's medications

manage many of her symptoms.  She has testified that her medicine helps with the headaches and

dizziness, and she has no ongoing care to monitor her pseudotumor cerebri.

She has not been hospitalized since at least November 15, 2012, and, as the ALJ notes in

his decision, apart from Stewart's two visits to Kingsbrook, her "subsequent treating record for

her pseudotumor cerebri does not reveal an ongoing degree of debilitating symptomology."  (*Id.*

at 121, 440.)  There is no evidence in the record that Stewart has received treatment for her

pseudotumor, apart from her visit with Dr. Edelstein, the ophthalmologist.  (*Id.* at 122.)

Stewart's neurologic and ophthalmologic examinations have been "within normal limits."  (*Id.* at

125.)  The ALJ also notes that Stewart is capable of using public transportation and does some

chores.  (*Id.* at 31.)  She can walk outside, with frequent breaks but without assistance.  (*Id.* at 373.)  Though Stewart's "activities are somewhat limited," the ALJ found that "they are not compatible with an individual who is completely incapable of all types of work activity."  (*Id.* at 124.)

The results of Dr. Finkelstein's examination also provide support for the ALJ's determination.  His findings were unremarkable, and included a mild limitation in Stewart's ability to walk, an inability to walk on her heels and toes, as well as abnormal tandem walking.  (*Id.* at 520.)  Sedentary work, however, requires only occasional walking and standing, and therefore, a mild limitation in Stewart's ability to walk does not preclude Stewart from performing sedentary work.  *See* 20 C.F.R. § 404.1567(a).  Dr. Finkelstein found no indication of memory loss.  (*Id.*)  He also accounted for and accommodated Stewart's risk of dizziness by finding that she should avoid heights and not operate heavy machinery.  (*Id.*)

Though Stewart alleges that the ALJ ignored her disc herniations and bulges, the ALJ properly considered her back problems and took into account the "deterioration in [Stewart's spinal condition" in fashioning the residual functional capacity.  (*Id.* 125.)  He rejected Dr. Marasigan's determination that Stewart could perform light work because Stewart's back problems had worsened since Dr. Marasigan examined her.  (*Id.*)  The ALJ specifically found that the problems with Stewart's spine problems could affect her ability to "stand and/or walk in a work setting."  (*Id.*)  Accordingly, substantial evidence supports the ALJ's determination that Stewart can work at a sedentary level with certain restrictions.

## IV.    The ALJ Properly Considered Stewart's Sleep Apnea

Stewart contends that the ALJ did not properly evaluate her sleep apnea and should have found that it constitutes a severe impairment.  (Pl.'s Mem. at 11.)  The ALJ considered Stewart's

sleep apnea, but found that it does not constitute a severe impairment. (Admin R. at 119–20.) The ALJ noted that Stewart had a successful CPAP titration study in December 2013, which treated her apnea. (*Id.* 119–20.) Stewart did not report any limitation caused by her sleep apnea after the CPAP titration study and does not appear to have received treatment for it either. Accordingly, substantial evidence supports the ALJ's conclusion that Stewart's sleep apnea was not a severe impairment.

## CONCLUSION

For the reasons stated above, the Commissioner's motion (Doc. No. 15) is granted, and Stewart's motion (Doc. No. 13) is denied. The Clerk of Court is directed to enter judgment accordingly, and close the case.


SO ORDERED.


Dated: Brooklyn, New York              *Roslynn R. Mauskopf*
      March 16, 2018

                                              _____
                                              ROSLYNN R. MAUSKOPF
                                              United States District Judge